**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY** | § | |
| **COMMISSION,** | § | |
|     **Plaintiff** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. C-04-416** |
| | § | |
| **CASH & GO, LTD.,** | § | |
|     **Defendant** | § | |

## MEMORANDUM AND RECOMMENDATION

The Equal Employment Opportunity Commission ("EEOC") filed this lawsuit on behalf of Connie Damron and a class of similarly situated female employees of defendant Cash & Go, Ltd. ("Cash & Go"). The other named employees are Kitty Hash, Linda Mendietta Valenzuela, Araceli "Sally" Ortega, Doris Park, Silvia Rodriguez, Lee Ann Liserio and Patricia Ann Livas. Plaintiff alleges violations of the employees' rights pursuant to Sections 15(a)(3), 16(c) and 17 of the Fair Labor Standards Act of 1938 ("FLSA"), as amended, 29 U.S.C. §§ 215(a)(3), 216(c) and 217, to enforce the requirements of the Equal Pay Act of 1963 ("EPA"), codified as Section 6(d) of the FLSA, 29 U.S.C. §206(d). Plaintiff also seeks relief for the employees under Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e-3(a), 2000e-5(f)(1) and (3) and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).

Plaintiff alleges that defendant paid female employees less money than similarly situated male employees and also that defendant terminated a female employee for misconduct but took no

action against a male employee who engaged in similar conduct.  Defendant filed a motion for

summary judgment on May 16, 2005 to which plaintiff responded on June 6, 2005 (D.E. 18, 20).

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 1343.

## BACKGROUND

The following facts are taken from the pleadings and exhibits submitted in this case and

have been construed in the light most favorable to plaintiff.  Defendant Cash & Go is a joint

venture limited partnership established by SSP and First Cash Financial, Inc., in 1999 to provide

short-term loans and check cashing from kiosks located inside convenience stores in Texas.

Jamiel "Jim" Farha is the president of the company (Farha Depo., D.E. 20, Ex. A-2, p. 8).  In May

2005 Cash & Go was operating 18 kiosks in Corpus Christi, seven kiosks in the

Victoria/Beeville/Sinton area, two kiosks in Wichita Falls and 13 kiosks in the Rio Grande Valley

(Farha Depo., D.E. 20, Ex. A-2, pp. 13, 21, 32).

### 1. Connie Damron

Damron was hired as a teller for Cash & Go on November 15, 1999 at the rate of $7.50

per hour.  On February 28, 2000 she was promoted to administrative assistant and her pay

increased to an annual salary of $21,600.  In June 2000 she was promoted to area manager for the

Corpus Christi area with no increase in pay.  In August 2000 Damron received a merit increase

which raised her annual salary to $23,000 per year.  In February 2001 Damron received a 5%

merit increase which raised her salary to $24,150.  In January 2001 Damron was given the new

title of senior area manager and also was known as the area manager supervisor because she

supervised other area managers in the Corpus Christi area.  On March 26, 2001 she received a pay

2

increase to $25,150 per year.  The payroll change form authorizing the pay increase identified her

title as "Area Manager Supervisor."  As of December 20, 2002, the day she was terminated,

Damron's salary was $27,000.  In addition to her salary, she earned performance bonuses based

on the amount of sales at the stores she supervised (Damron Aff., D.E. 20, Ex. 7, p. 1).

Damron performed all of the duties of an area manager, including supervising the operation

of existing stores in her area and setting up and opening a number of new stores during the "build

out" period in the Corpus Christi area.  In addition, Damron had duties outside the scope of the

area manager job description which other area managers did not have, such as setting up and

administering Cash & Go's health insurance program, setting up telephone and pager accounts for

Cash & Go's stores and for the corporate office, making changes to vendors' accounts and

collecting end-of-day and monthly reports for her area stores (Damron Aff., D.E. 20, Ex. 7, pp. 2-

3).

Prior to working for Cash & Go, Damron worked as a customer service manager for Wal-

Mart stores, including a Wal-Mart Supercenter where she managed more than 12 cashiers and was

responsible for thousands of dollars of sales each day.  She also worked as an officer manager for

an animal hospital, where she scheduled employees and managed the business affairs and

collections.  In addition, she worked as a manager at the Country Cajun restaurant (Damron Aff.,

D.E. 20, Ex. 7, pp. 3-4).  Plaintiff attended Del Mar College, although she did not complete a

degree (Damron Aff., D.E. 20, Ex. 7, p. 4).

While working for Cash & Go, Damron became aware that she was being paid less than

two male area managers, Duke Davila and Rick Simmons, even though they were performing the

same jobs.  Damron complained about the difference in pay to Farha and Tyshawn Young, the

operations manager (Damron Aff., D.E. 20, Ex. 7, p. 4).

3

Damron was terminated from Cash & Go on December 20, 2002 and the reason given to her was that she was negligent in relation to cash shortages in the stores she managed.  Prior to her termination Cash & Go had implemented a new computer system for tracking the stores' transactions and at times, unexplained shortages would show up on the system.  The computer problems were well known.  Damron believed that the shortages in her stores did not reflect the actual loss of money, but were caused by computer errors.  During the period when the shortages occurred, Damron was not advised that her accounts were not balancing, but instead was told by accountant Kathy Loudermilk that the shortages should "even out" at the end of the month.  Damron was not advised that her store accounts were not balancing until she was formally disciplined by Farha on December 11, 2002 (Damron Aff., D.E.  20, Ex. 7, pp. 4-5).

When Farha told Damron about the shortages, she attempted to investigate and track down the shortages.  On December 18, 2002 someone in the accounting department told Damron that the shortages were balanced and that money had been credited to the stores where the shortages had occurred.  The next day, however, Damron was told that the accounts were not balancing.  Damron was terminated before she could thoroughly investigate the shortages (Damron Aff., D.E. 20, Ex. 7, p. 5).

Male area managers such as Roland Flores, Rick Simmons and Edgar Rico also registered thousands of dollars of shortages at stores they managed, but they were not terminated by Cash & Go.  Damron believes that the men received more favorable treatment because of their sex (Damron Aff., D.E. 20, Ex. 7, p. 5).

### 2.  Linda Mendietta Valenzuela[1]

Valenzuela was hired by Cash & Go on February 1, 2000 at the rate of $7.25 per hour.  She became an area manager on July 2, 2000 and received a pay increase to $21,600 annually.  On February 12, 2001 Valenzuela's pay was increased to $22,785.  Her annual salary was increased again on July 15, 2002 to $23,924.  On August 25, 2003 Valenzuela's pay was increased to $25,119 and on November 15, 2004 she received another pay increase, to $26,375 annually (D.E. 20, Ex. 8).

### 3.  Araceli "Sally" Ortega

Ortega was hired by Cash & Go as an area manager on August 6, 2001 at the rate of $8.65 per hour (D.E. 20, Ex. 8; Ortega Depo., Ex. A-4, p. 146-147).  At the time she applied at Cash & Go, Ortega was working at Burlington Coat Factory as a sportswear department manager making $12.25 per hour (D.E. 18, Ex. 2).  She took a pay cut when she moved to Cash & Go because she was tired of working in retail and did not want to work weekends and holidays (Ortega Depo., D.E. 20, Ex. A-4, p. 148).  She started as an "area manager in training" at the rate of $18,500 annually.  At her interview, Farha told her she would make $19,500 to start and that when she became an area manager her pay would increase and she probably would make as much as she did at her previous job.

On October 8, 2001 Ortega was named area manager and her pay was increased to $21,700 annually (D.E. 20, Ex. 29).  On October 8, 2002 Ortega received a pay increase to $22,784 (D.E. 20, Ex. 8).  Ortega's employment with Cash & Go ended on February 27, 2003 (D.E. 20, Ex. 8).

---

[1]Linda Valenzuela is the same person as Linda Mendietta.  Compare Complaint, D.E. 1, p. 6 and Response to Motion for Summary Judgment, D.E. 20, p. 1.

### 4. Kitty Hash

Kitty Hash was hired as an area manager for the Wichita Falls stores by Cash & Go on August 20, 2001 at the rate of $18,500 annually.  Her pay was increased on April 9, 2002 to $21,700.  On May 5, 2003 Hash's pay was increased to $22,784 annually and on November 15, 2004 it was increased again to $23,923 annually (D.E. 20, Ex. 8).

### 5. Ben Walker

Hash replaced Ben Walker, who had been hired approximately eight weeks before Hash. Walker was terminated after working eight weeks for failure to follow instructions and because there had been multiple complaints about his management style (D.E. 20, Exs. 3, 8).  Walker was hired at the rate of $27,600 annually (D.E. 20, Ex. 8).

### 6. Duke Davila

Duke Davila was hired by Cash & Go as an area manager on April 10, 2000 at the rate of $38,000 annually (D.E. 20, Ex. 18).  In 2001, his annual pay was $44,200.04 with bonuses (D.E. 20, Ex. 20).  On April 9, 2000 Davila received a base pay increase to $40,700 annually.  On August 25, 2003 Davila's pay was increased to $42,734 annually.  On November 15, 2004 Davila's pay was increased to $44,870.80 annually (D.E. 20, Ex. 8).

### 7. Ricky D. Simmons

Ricky D. Simmons was hired as an area manager on August 7, 2001 at the rate of  $28,000 annually (D.E. 20, Ex. 8).  On October 21, 2002 Simmons' pay was increased to  $29,400 and on October 25, 2003 Simmons' pay was increased to $30,869 (D.E. 20, Ex. 8).  Simmons received a pay increase to $32,410 on November 15, 2004 (D.E. 20, Ex. 8).

**9.  Sylvia Rodriguez, Doris Park, Lee Ann Liserio and Patricia Ann Livas**

Rodriguez, Park and Liserio all work as area managers and all currently earn $21,700 annually (D.E. 20, Ex. 8).  Rodriguez was named area manager in February 2003 and made $18,000 until she received a pay increase to $21,700 in December 2003 (D.E. 20, Ex. 8).  Livas was named area manager in September 2004 and currently earns the training rate of $18,000 (D.E. 20, Ex. 8).

**10.  Edgar Rico**

Rico was named area manager in September 2002 and began earning $21,700.  Because of store closings, Rico was demoted to store manager in August 2003 and received a pay decrease to $8.50 per hour.  He was promoted to area manager again in February 24, 2004 and received a pay increase to $22,785.  As of November 15, 2004 Rico was earning to $23,555 annually (D.E. 20, Ex. 8).

In its motion for summary judgment, Cash & Go makes the following arguments: (1) the differences in pay between male and female Cash & Go employees are a result of their varying qualifications and the responsibilities associated with their respective positions; (2) Damron's termination had nothing to do with her sex but was the result of misconduct because she failed to properly supervise and audit her stores, resulting in the loss of more than $13,000.  Plaintiff counters that fact questions preclude summary judgment exist on all the relevant issues.

## APPLICABLE LAW

### A.  Summary Judgment Standard

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See Fed.R.Civ.P. 56(c).  An issue is

material if its resolution could affect the outcome of the action.  Daniels v. City of Arlington, 246 F.3d 500, 502 (5th Cir.), cert. denied, 122 S. Ct. 347 (2001).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, drawing all justifiable inferences in favor of the party opposing the motions.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  The Court will not weigh the evidence or evaluate the credibility of witnesses.  Caboni v. General Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The movant bears the initial burden of showing the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  If the movant demonstrates there is an absence of evidence to support the nonmovant's case, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  To sustain this burden, the nonmovant cannot rest on the mere allegations of the pleadings.  See Celotex, 477 U.S. at 324, 106 S. Ct. at 2553; Caboni, 278 F.3d at 451; FED.R.CIV.P. 56(e).  After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted.  Caboni, 278 F.3d at 451.

**B.  Equal Pay Act**

Under the EPA, an employer is prohibited from discriminating between employees on the basis of sex by paying wages to employees at a lower rate than those paid to members of the opposite sex for equal work on jobs which require equal skill, effort and responsibility and which

8

are performed under similar working conditions.  An exception exists when payment is made

pursuant to (1) a seniority system; (2) a merit system; (3) a system which measures earnings by

quantity or quality of production; or (4) a differential based on any other factor other than sex.  29

U.S.C. §206(d)(1).

      To establish a prima facie case under the EPA, a plaintiff must show the following: (1) his

or her employer is subject to the Act; (2) he or she performed work in a position requiring equal

skill, effort, and responsibility under similar working conditions and (3) he or she was paid less

than the employee of the opposite sex providing the basis of comparison.  Chance v. Rice

University, 984 F.2d 151, 153 (5th Cir. 1993).  Unlike Title VII, under the EPA a plaintiff need not

show discriminatory intent to establish a prima facie case.  Peters v. City of Shreveport, 818 F.2d

1148, 1153 (5th Cir. 1987).  A showing of "equal work" requires only that the plaintiff prove that

the skill, effort and responsibility required in the performance of the jobs compared are

substantially equal.  Peters, 818 F.2d at 1153(citations omitted).  A plaintiff need not prove that

she was paid less than every comparable male employee, but just that there was discrimination in

pay with respect to one employee of the opposite sex.  See EEOC v. White & Son Enter., 881 F.2d

1006, 1009 (11th Cir. 1989).  The issue of whether two or more jobs require equal work for EPA

purposes is decided on a case-by-case basis.  Brobst v. Columbus Serv. Int'l, 761 F.2d 148, 156

(3rd Cir. 1985).

      If the plaintiff succeeds in establishing a prima facie case, the burdens of production and

persuasion shift to the employer to demonstrate as an affirmative defense that the difference in

wages is justified by one of the exceptions specified under the EPA.  Corning Glass Works v.

Brennan, 417 U.S. 188, 196-197, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974);  Peters, 818 F.2d at

1153.  Factors other than sex upon which an employer may properly rely include unique

9

characteristics of the same job, an individual's experience, training or ability, or special exigent circumstances connected to the business.  Irby v. Bittick, 44 F.3d 949, 955 (11th Cir. 1995)(internal quotation omitted).  The employer bears the burden of showing that it has established the defense so clearly that a jury could only conclude that the pay difference is due to a factor other than sex.  Buntin v. Breathitt County Board of Education, 134 F.3d 796, 800 (6th Cir. 1998).

### 1.  Damron and Davila

When Damron began working as an area manager in 2000 she was making $21,600 per year and when she was terminated in December 2002 she was making $27,000.  When  Davila was hired as an area manager in 2000 he was paid $38,000 per year and in December 2000 Davila was making $40,700.  Although both employees were hired as area managers, Davila has always been paid more than Damron.  Cash & Go presents four arguments for why Davila was paid the higher salary.

### (a) Davila's responsibilities

Cash & Go argues that Davila was not merely an area manager, but was hired to expand the operation of Cash & Go in the Rio Grande Valley and to open 25 new stores there.  Farha stated that Davila would be working with a minimum of oversight because Farha was based in Corpus Christi and Davila would be in the Valley.  He also had the responsibility of hiring area managers (not just store personnel) and hired three area managers, Roland Flores, Eloy DeLeon and Edgar Rico, while Damron never had the responsibility of hiring or managing area managers (Farha Aff., D.E. 18, Ex. A, p. 3).

Evidence in the record contradicts Farha's assertion.  Employment records show that Davila was hired as an area manager, not as a division manager or area manager supervisor (D.E. 20. Exs. 18, 19) and witnesses testified that he had the same scope and degree of responsibilities as the other area managers.  Linda Valenzuela testified that Farha never described Davila as a division manager during staff meetings and that he was known only as an area manager (Valenzuela Depo., D.E. 20, Ex. A-6, p. 38).  Tyshawn Young, the operations manager, also described Davila as an area manager, rather than a division manager (Young Depo., D.E. 20, Ex. A-4, p. 169).

Other evidence shows that Farha and Young continued to supervise the area managers in the Valley, although they were both based in Corpus Christi.  DeLeon was promoted from a collector to an area manager by Young and later was given a pay raise by Farha (D.E. 20, Exs. 13, 14).  DeLeon responded in a memo to disciplinary action imposed by Farha in Feburary 2004 (D.E. 20, Ex. 15).  Rico was an area manager in the Valley and his pay increases were authorized by Farha, rather than Davila (D.E. 20, Exs. 16 and 17).  Rico testified that when he was promoted from store manager to area manager he was interviewed by Farha and not Davila and that he was trained by another area manager, Roland Flores (Rico Depo., D.E. 20, Ex. A-2, pp. 13-14).  Flores and Farha, rather than Davila,  signed off on other employment decisions regarding Rico (D.E. 20, Exs. 16, 17).  Davila never completed an employee performance appraisal or a recommendation form for an area manager (Davila Depo., D.E. 20, Ex. A-7, p. 67).

Plaintiff also presented evidence that Damron's responsibilities were greater than those of any other Cash & Go area manager, including Davila.  Damron testified that she and Tyshawn Young opened stores (Damron Depo., D.E. 20, Ex. A-5, pp. 40-41).  Linda Valenzuela testified that she helped Damron open up stores (Valenzuela Depo., D.E. 20, Ex. A-6, p. 21).  Young testified that she opened a store with Damron's assistance and that she was training Damron to do

11

it because more than one person needed to know how to open a store (Young Depo., D.E. 20, Ex. A-3, pp. 135, 197-198).  Young also testified that Damron was known as the "senior area manager" because she was second in line when Young was unavailable.  Damron had the authority to approve cashing checks for high amounts and other area managers, including Davila, needed either Damron or Young to approve large checks (Young Depo., D.E. 18, Ex. A-3, p. 202). Damron was named "area manager supervisor" by Farha in April 2001 (D.E. 20, Ex. 6) and also was referred to as "senior area manager" by Farha (D.E. 20, Ex. 11).

**(b) Davila's education**

Another reason given by Farha for paying Davila more was that Davila has a college degree in business with an emphasis in marketing and that he was responsible for marketing in the Valley.  However, whether Davila's college degree is relevant depends on whether the nature of his duties required the use of his marketing skills. Salazar v. Marathon Oil Co., 502 F.Supp. 631, 636 (D.C. Tex. 1980)(citing Peltier v. City of Fargo, 533 F.2d 374 (8th Cir. 1976)).  Evidence in the record contradicts the assertion that Davila was hired to do marketing.  Natalie Sanchez Cooke was hired as marketing director for Cash & Go three months before Davila was hired (D.E. 20, Exs. 8, 23, 24).  She stated in an affidavit that she was in charge of marketing for Cash & Go in Corpus Christi, Victoria and the Rio Grande Valley (Cooke Aff., D.E. 20, Ex. 10, p. 1).  After Cooke resigned, Eloy DeLeon assumed the marketing duties and only when DeLeon left in February 2004, did Davila start handling the marketing with Farha's help (D.E. 20, Exs. 8, 15, 25; Farha Depo., Ex. A-3, p. 12).

12

**(c) Davila's past experience**

Another reason given for the difference in Davila's pay is that he had experience  managing sales managers and sales representatives and also experience developing market strategies on a statewide basis.  Farha determined that Davila's credentials would be useful in expanding the Cash & Go operation in the Valley.

The EEOC counters that the evidence is unclear that Davila was expected to either manage other area managers or that he would be responsible for expanding Cash & Go operations in the Valley.  The advertisement for Davila's position was simply for an area manager for stores in the Harlingen, Brownsville and McAllen area (D.E. 20, Ex. 22).  Also, as discussed above, the evidence does not support the conclusion that Davila was in charge of marketing for the Valley prior to 2004.

Young testified that when she and Farha were looking for an area manager for the Valley, they budgeted approximately $20,000 for the position.  Davila demanded a much higher salary and he and Farha negotiated the $38,000 annual salary.  When Young asked Farha why Davila was going to make almost as much as she was when no stores were yet open for him to supervise, Farha told her, "This is a man with a family to support."  (Young Depo., D.E. 20, Ex. A-3, pp. 188-190).  The evidence calls into question Cash & Go's explanation regarding its decision to pay Davila a higher salary than Damron.

**(d) Davila's prior salary**

Another reason given by Cash & Go for the pay difference was that Davila originally had asked for a salary higher than $38,000 because he had been making $55,000 in his previous job. In Siler Khodr v. University of Texas Health Science, 261 F.3d 542, 549 (5th Cir. 2001) the Court

found that evidence that an employee's primary reason for taking a job was not related to salary was sufficient to rebut the affirmative defense that an employer paid a male employee more than a female employee in order to match the male employee's previous salary.  In this case, there is evidence that Davila had been unemployed for some time and had accumulated unpaid bills (Davila depo., D.E. 20, Ex. A-7, pp. 13-14; Young Depo., D.E. 20, Ex. A-3, pp. 97-98).  Given this evidence, a jury might find unpersuasive Cash & Go's argument that it had to offer Davila a higher rate of pay in order to have him accept the job.  Also, Siler-Khodr emphasized an earlier Fifth Circuit statement that the argument that market forces required a man to be paid more than a woman is not tenable under the EPA.  Id., (citing Brennan v. City Stores, Inc., 479 F.2d 235, 241, n. 12 (5th Cir. 1973)(a tighter market for salesmen and male tailors did not justify the hiring of men with such skills at a rate higher than that paid to obtain women of similar skills).

Fact issues surround the reasons given by Cash & Go for paying Davila more than Damron. It is not clear from the record that Davila was more qualified for his position than Damron or that his job involved more or different responsibilities than did Damron's job.  Accordingly, summary judgment is not appropriate.

### 2.  Damron and Simmons

When Damron was promoted to area manager in June 2000 she was making $21,600 and she received a merit increase in August 2000 to $23,000.  When she was terminated in December 2000 she was making $27,000.  Simmons was hired as an area manager for the Victoria/Beeville/Sinton area in August 2001 at the initial rate of $28,000 and in December 2002 he was being paid $29,400 annually.

Farha explains that Simmons was paid a higher rate than Damron because he had 20 years of experience in managing multi-site convenience stores for Coastal Maverick.  Also, the area he

14

would manage, like the Valley, was removed geographically from the Corpus Christi headquarters and Farha could not oversee the management of that area on a daily basis.  Therefore, the area manager in that area had more responsibilities than the area managers in Corpus Christi (Farha Aff., D.E. 18, Ex. A, p. 5).  Also, the manager in the Victoria area had to oversee the collections in his stores.  In Corpus Christi, there are four collectors for 18 stores and there is a collections manager that oversees the collectors.  In the Victoria area, there is only one collector for all seven stores and Simmons oversees the work of that collector (Id.).

Plaintiff  responds that although Simmons had experience managing convenience stores, he had no experience in the short-term loan industry and at the time Simmons was hired, Damron had been managing Cash & Go kiosks successfully for more than 17 months (D.E. 20, Exs. 8, 27).  Plaintiff further argues that the assertion that Simmons warranted a higher salary because he managed a collector is false because all of the area managers oversaw collectors and Valenzuela even supervised the collections supervisor (Valenzuela Depo., D.E. 20, Ex. A-6, p. 217).

Fact questions preclude summary judgment on the issue of why Simmons was paid more that Damron.  Summary judgment should not be entered for Cash & Go and plaintiff should be allowed to proceed with its cause of action on behalf of Damron.

### 3.  Ortega, Valenzuela and Simmons

Cash & Go argues that Ortega and Valenzuela were paid less than Simmons because Simmons' store has a higher volume of loans than the women's stores which means Simmons has a greater degree of responsibility and has to work harder to audit the stores than the women do.  Cash & Go also repeated its arguments that Simmons oversees a collector while the women have a manager over their collectors, and also that Farha did not directly oversee Simmons because he

worked in a different geographic area, meaning Simmons had a greater degree of responsibility (Farha Aff., D.E. 18, Ex. A, p. 6).

Plaintiff responds that defendant's reasons for paying Simmons a higher salary are vague, and that it did not address the fact that Ortega also made less than two other male area managers, Ben Walker and Frank Schneider (D.E. 20, Exs. 8, 9).  Also, although Simmons and Ortega were hired at the same time and trained together, Ortega was classified as an "area manager in training" for two months and was paid $8.65 per hour, or $17,992 annually for a forty hour week, while Simmons was paid $28,000 (D.E. 20, Ex. 8).  When Ortega was named area manager her pay was increased to $21,700 annually (D.E. 20, Ex. 8).  None of the four male area managers hired before Ortega had to work as managers in training and all were paid at least $21,684 at the time they were hired (D.E. 20, Ex. 8).  In addition, Ortega took over the extra responsibility of managing the Cash & Go insurance program when Damron was terminated, but still made only $22,784 while Simmons made $30,870 (D.E. 20, Ex. 8).

Valenzuela started working at Cash & Go in July 2000 as an area manager at the rate of $7.50 per hour.  Approximately 13 months later, when Simmons was hired as an area manager at the rate of $28,000, Valenzuela was making $22,785.  As of November 15, 2004, Simmons was making $32,410 annually while Valenzuela was making $26,375.  In addition, Valenzuela supervises more stores than any other area manager and her stores have a volume comparable to that of Simmons' stores (Valenzuela Depo., D.E. 20, Ex. A-6, pp. 112-113).

Cash & Go pointed out that Damron, Ortega and Valenzuela consistently have been paid more than some male area managers, including Roland Flores, Edgar Rico and Eloy DeLeon (Farha Aff., D.E. 18, Ex. A, p. 6).  Although this appears to be true, it is not dispositive of plaintiff's cause of action.

16

> A plaintiff fulfills its burden by showing that an employee has been discriminated against in terms of pay vis-a-vis one employee of the opposite sex.  Defendant cannot defeat this showing by alleging that plaintiff did not identify all employees doing substantially equal work.  Rather, if defendant feels that there are other equally appropriate comparators, it must bring them to the attention of the court in order for an accurate determination of back pay to be made.

Brock v. Georgia Southwest College, 765 F.2d 1026, 1033, n. 2 (11th Cir. 1985).

Fact issues exist which preclude summary judgment for Cash & Go.  Plaintiff should be allowed to proceed with its cause of action on behalf of claimants Ortega and Valenzuela.

### 4.  Hash and Walker

In the summer of 2001, Cash & Go interviewed Ben Walker and Kitty Hash for the position of area manager over two stores in Wichita Falls.  Ben Walker was hired at the rate of $27,600 (D.E. 20, Ex. 8).  He was terminated within two months for insubordination and sexual harassment (Farha Aff., D.E. 18, Ex. A, p. 6).  Hash then was hired as an area manager in training at the rate of $18,500 and upon promotion to area manager in April 2002 received a pay increase to $21,700 annually (D.E. 20, Exs. 4, 28).  As of November 15, 2004 Hash was making $23,923 annually (D.E. 20, Ex. 8).

Farha explains the pay difference by stating that Young, the operations manager, wanted to hire Walker, but Walker would not accept the amount offered--between $18,000 and $21,000.  Farha said that Cash & Go agreed to pay Walker approximately $25,500 to be area manager for the two stores in Witchita Falls.  When Hash was hired, Cash & Go offered her $18,500, the amount that Farha and Young thought was appropriate for the position (Farha Aff., D.E. 20, Ex. A, p. 6).

Farha did not recall the background or experience of either Walker or Hash and offered no explanation for the difference in pay other than Walker would not agree to work for the lesser

17

amount (Farha Aff., D.E. 18, Ex. A, pp. 6-7; Farha Depo., D.E. 20, Ex. A-1, pp. 232-234).

Without more, Cash & Go cannot meet its burden of showing that the pay difference was for a

reason other than sex and summary judgment should not be entered for defendant on this issue.

### 5. Rodriguez, Park, Liserio, Livas and Rico

Rodriguez, Park and Liserio are all area managers and all make $21,700 per year. Livas

has been an area manager in training since September 2004 and makes $18,000 per year. Rico is

an area manager and makes $23,555 annually (D.E. 20, Ex. 8).

Farha states that the reason Rico makes more than Park or Liserio is that he was named

area manager in September 2002 and the women did not become area managers until August 2004.

When Rico was first named area manager, he made $21,648. Farha states that Rodriguez, who no

longer works for Cash & Go, started out as a teller and eventually was promoted to area manager

in training followed by area manager. At the time she was named area manager in December

2003, she was making $21,700. Farha also points out that Livas is not an area manager but is still

in training and does not manage her own stores and so is not a valid comparator (Farha Aff., D.E.

18, Ex. A, p. 7).

Plaintiff responds that the differences in pay between Livas, Liserio and Rico cannot be

explained by seniority because Livas and Liserio were both hired the year before Rico was hired.

Both women were hired as tellers and worked their way up to the position of area manager (D.E.

20, Ex. 8). Also, plaintiff points out that Rodriguez was hired within six months of Rico and she

became area manager before the period when Rico had been demoted and she worked as an area

manager during the time Rico worked as a store manager. When Rico was appointed area manager

again in February 2004, he received a pay increase to $22,785 and nine months later received

another pay increase to $23,555.  In February 2004 Rodriguez was making $18,000 annually and currently makes $21,700 (D.E. 20, Ex. 8).

While a seniority system may justify pay differences, in this case Cash & Go does not appear to award pay increases on a systematic basis.  An examination of the wage histories of various employees shows that pay rates and increases do not seem to be based on any discernible criteria and intervals between pay increases vary significantly from employee to employee (D.E. 20. Ex. 8).  Accordingly, fact questions exist regarding Cash & Go's affirmative defense that pay rates for Rodriguez, Park, Liserio, Livas are lower than those of Rico because they are based on a seniority system.

Because fact issues exist on all of plaintiff's EPA causes of action, summary judgment should not be entered for defendant Cash & Go.  The facts should be presented to a jury so that a proper credibility determination can be made.

## C.  Title VII Cause of Action

Plaintiff asserts that Damron was terminated when she had a shortage in her stores while a male employee who had a shortage in his stores was not terminated.  Under Title VII, it is unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2.  The analysis of a Title VII case is well known:

> The plaintiff must establish a prima facie case that the defendant made an employment decision that was motivated by a protected factor.  Once established, the defendant bears the burden of producing evidence that its employment decision was based on a legitimate nondiscriminatory reason.  The burden then shifts back to the plaintiff to prove that the defendant's proffered reasons were a pretext for discrimination.  But, if the defendant has offered a legitimate nondiscriminatory reason for its action, the presumption of

19

discrimination derived from the plaintiff's prima facie case 'simply drops out of the picture,' . . .and 'the ultimate question [is] discrimination *vel non*.'

Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1089-90 (5th Cir. 1995)(citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 246, 253-257, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981);  McDonnell Douglas Corporation v. Green, 411 U.S. 792, 803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1971)).

The focus then shifts to the ultimate question of whether the defendant intentionally discriminated against the plaintiff.  Grimes v. Tx. Dept. of Mental Health, 102 F.3d 137, 140 (5th Cir. 1996)(citing Hicks, 509 U.S. 502, 510-511, 113 S.Ct. 2742, 2749, 124 L.Ed.2d 407 (1993)). Title VII plaintiffs must ordinarily prove their claims through circumstantial evidence and may do so by demonstrating that a defendant's articulated non-discriminatory reason was pretextual. Grimes, 102 F.3d at 141 (citations omitted).  A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may, but does not necessarily, permit the trier of fact to conclude that the employer unlawfully discriminated. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors.  Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  Id., 530 U.S. at 148-149, 120 S.Ct. at 2109.

**1.  Prima Facie Case**

In order to make out a prima facie case of employment discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified to do her job; (3) despite

her qualifications, her employment situation was adversely affected and (4) similarly situated employees were treated more favorably.  Urbano v. Continental Airlines, Inc., 138 F.3d 204, 206 (5th Cir. 1998); See Young v. City of Houston, 906 F.2d 177, 180 (5th Cir. 1990)(citations omitted).

In claims involving violation of work rules, a plaintiff may establish a prima facie case by showing either that she did not violate the rule, or that if she did, male employees engaged in similar conduct were not punished in a similar fashion.  Mayberry, 55 F.3d at 1090 (citing Green v. Armstrong Rubber Co., 612 F.2d 967, 968 (5th Cir. 1980)).  In this case, Damron is a member of a protected class, her employment situation was adversely affected and she claims that a man, Roland Flores, engaged in similar behavior but was treated more favorably.  Accordingly, she has made out a prima facie case.

## 2. Legitimate Nondiscriminatory Reason

Cash & Go argues that Damron was not terminated because of the shortages, but because she failed to properly investigate the loss.  According to Farha, starting in September 2002, Damron's stores had shortages in excess of $13,000.  As an area manager, Damron was supposed to review the reconciliation reports that were sent to her several times per month for possible theft by tellers at her store (Farha Aff., D.E. 20, Ex. A, pp. 7-8).

Damron's stores showed shortages from September 2002 to December 20, 2002 but Damron never told Farha that she investigated the shortages or determined their cause.  Farha heard from Katherine Loudermilk, who did the accounting for Cash & Go, that Damron asked her to reclassify the shortages, or to move them from the "shortage" column and place them in the "collections" column on the reconciliation report, indicating that the amounts by which the accounts were short were not losses, but were pending collection.  Farha considered Damron's

request to be dishonest and an attempt to conceal the source of the shortages (Farha Aff., D.E. 18, Ex. A, p. 8).

On December 11, 2002 Farha gave Damron a written warning and told her she had one week to investigate the shortages and report back to him.  Damron replied that she wanted an opportunity to investigate the shortages from September through December (Farha Aff., D.E. 18, Ex. A, p. 8 and attached exhibits).  Farha conferred with Loudermilk and with the director of human resources, who recommended that Damron be terminated because of the seriousness and ongoing nature of the shortages.  Farha agreed and terminated Damron on December 20, 2002.  A subsequent audit of Damron's store which had the biggest loss showed probable theft by one or both store tellers.  The police told Farha that because of the on-going nature of the loss, it would be too difficult to prosecute and Farha did not further pursue prosecution (Farha Aff., D.E. 18, Ex. A, p. 8).

Damron claims that Roland Flores also had a big loss at his store but was not terminated. Farha counters that Flores discovered the theft, brought it to Farha's attention, terminated the employee who stole the money and filed a police report (Farha Aff., D.E. 18, Ex. A, pp. 8-9). Cash & Go asserts that Damron was not terminated because of the loss itself, but because she failed to investigate the loss in a prompt and proper manner and then tried to conceal the nature of it (Farha Aff., D.E. 18, Ex. A, p. 9).  Farha also pointed out that a female area manager, Natalie Sanchez, also had a loss in her store, but because she handled the investigation well, she was not terminated (Id.).  Farha's description of events sets forth a legitimate, nondiscriminatory motive for terminating Damron.

22

### 3.  Pretext

Plaintiff argues that the record contains evidence that, if considered by a jury, might persuade it that Cash & Go's reasons for termination were a pretext for discrimination.  E-mails generated on December 18, 2002 between Farha, Loudermilk and Doug Orr indicate that rather than being short $13,000, three of Damron's stores were due credit for December in the amount of $7,670, which reduced her shortage at store 609 to $2006.  Her shortages at stores 601 and 603 totaled $472 in November and did not warrant reconciliation.  Loudermilk was still working on the audit of store 667 and expected to have it finished the next day (D.E. 20, Ex. 32).

Plaintiff also points out that it is not clear that a theft occurred at Damron's stores.  Farha called a police investigator to ask him for help in trying to determine whether they had an employee theft at the store, but Farha never filed a police report (Farha Depo., D.E. 20, Ex. A-1, p. 251).  Loudermilk testified that she did not know whether a theft occurred at Damron's stores in 2002 (Loudermilk Depo., D.E. 20, Ex. A-8, p. 41).

Plaintiff also disputes whether Damron took steps to investigate the losses in a timely manner.  Damron stated that it was not unusual for shortages to appear on accounting reports but it was expected that the shortages would balance out at the end of the month when checks cleared at the bank after accounting reports were issued.  Also, prior to the time the losses occurred in her stores, Cash & Go had implemented a new computer system which had caused problems with unexplained shortages or credits showing up on the system.  Damron believed that the shortages in her stores were caused by computer problems (Damron Aff., D.E. 20, Ex. 7, p. 4).

During the period the shortages were occurring, Loudermilk told her that they should "even out" at the end of the month and Damron was not informed that the cash shortages were not balancing until she was disciplined by Farha on December 11, 2002.  At that point, she began

23

researching the losses.  On December 18, 2002 someone in accounting told her that the shortages were balancing and that money had been credited to the stores where the shortages had occurred. The next day she was told that the shortages were not balancing and she was terminated before she could thoroughly investigate the cause of the shortages (Damron Aff., D.E. 20, Ex. 7, p. 5).

Farha stated that Flores was not terminated because he properly investigated the theft in his store, filed a police report and fired the employee suspected of theft.  Damron was terminated even though it is unclear from the record how much her stores were short, whether she was given an adequate opportunity to investigate the losses and whether a theft occurred.  A jury could conclude from these facts that the reasons given for Damron's termination were a pretext for discrimination based on her sex.  Accordingly, summary judgment should not be entered for Cash & Go.

## RECOMMENDATION

For the reasons set forth above, it is respectfully recommended that defendant's motion for summary judgment (D.E. 18) be denied and that plaintiff be allowed to proceed with its causes of action against defendant.

Respectfully submitted this 28th day of June, 2005.


B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

24

**NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1)(C) and Article IV, General Order No. 80-5, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Services Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).